## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| NIKHIL BHARADWAJ JOIS,<br><br>        Plaintiff,<br><br>   vs.<br><br>INDIANA UNIVERSITY, INDIANA UNIVERSITY BOARD OF TRUSTEES, EMILY C. WALVOORD, JAY L. HESS, IYABODE OKORO, ANDREW S. DEANE, MICHAEL J. KLEMSZ, ABIGAIL KLEMSZ, and JOHN DOES 1-25,<br><br>        Defendants. | Hon. _____<br><br>Civil Action No.: _____<br><br>**COMPLAINT<br>AND JURY DEMAND** |

### COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, NIKHIL BHARADWAJ JOIS**,** by and through his attorneys, Lento Law Group, and by way of Complaint, brings this action for damages and other legal and equitable relief against Defendants, INDIANA UNIVERSITY, INDIANA UNIVERSITY BOARD OF TRUSTEES, EMILY C. WALVOORD, JAY L. HESS, IYABODE OKORO, ANDREW S. DEANE, MICHAEL J. KLEMSZ, ABIGAIL KLEMSZ, and JOHN DOES 1-25, alleging as follows:

### INTRODUCTION

1.      This action is seeking damages for Defendant's violations of 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, Title III of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. Defendants are also responsible for breach of contract, promissory estoppel, and intentional infliction of emotional distress.

2.      On or about July 13, 2022, Plaintiff, NIKHIL BHARADWAJ JOIS, was dismissed from the Indiana University School of Medicine Program.

3.      The academic decision to dismiss Plaintiff was discriminatory, arbitrary, and unfair.

4.      Plaintiff received inadequate training and was not provided with the adequate materials and resources needed in medical school, which ultimately resulted in his dismissal and subsequent withdrawal from the program.

## **PARTIES**

5.     At all times relevant hereto, Plaintiff, NIKHIL BHARADWAJ JOIS,  is an adult resident citizen of the State of Indiana. Further, at all times relevant to this Complaint, Plaintiff was a student in the Indiana University School of Medicine program at Indiana University.

6.     At all times relevant hereto, Defendant INDIANA UNIVERSITY (hereinafter, "IU" or "the University") is a public, state-controlled institution of higher education and a citizen and domiciliary of the State of Indiana. IU has its principal place of business at 340 West 10th Street Fairbanks Hall, Suite 6200, Indianapolis, Indiana.

7.     At all times relevant hereto, Defendant INDIANA UNIVERSITY BOARD OF TRUSTEES (hereinafter, "IU Board of Trustees") is a political subdivision of Indiana University. The IU Board of Trustees is responsible for the University's administration and policymaking.

8.     At all times relevant hereto, Defendant, DR. EMILY C. WALVOORD, is an adult resident citizen of Indianapolis, Indiana and is believed to be servable at MSA3, 575 Riley Hospital Dr, Indianapolis, IN 46202.

9.     Further, Defendant Walvoord is a medical doctor within the State of Indiana practicing pursuant to a medical license bearing License No.: 0104834.

10.    Defendant Walvoord is the associate Dean of Medical Education, admissions, and student affairs at Indiana University School of Medicine (hereinafter, "IUSM").

11.    Defendant Walvoord directly interacted with Plaintiff as part of Plaintiff's dismissal from IUSM and acted in violation of Plaintiff's rights under Title VI of the Civil Rights Acts of 1964, Title III of the ADA, and Section 504 of the Rehabilitation Act.

12.    Furthermore, Defendant Walvoord acted negligently in approving Plaintiff's dismissal from IUSM, which also breached the contractual relationship between Plaintiff and IUSM.

13.    At all times relevant hereto, Defendant, DR. JAY L. HESS, is an adult resident citizen of Indianapolis, Indiana and is believed to be servable at MSA3, 575 Riley Hospital Dr, Indianapolis, IN 46202.

14.    Defendant Hess is a medical doctor within the State of Indiana practicing pursuant to a medical license.

15.    Defendant Hess is the Executive Vice President for IU Clinical Affairs and is the Dean of Medical Education.

16.   At all times relevant hereto, Defendant, DR. IYABODE OKORO, is an adult resident citizen of Indianapolis, Indiana and is believed to be servable at 635 Barnhill Drive, VanNuys Medical Science Building Suite 110, Indianapolis, IN, 46202.

17.   Defendant Okoro is an Academic Advisor at IUSM.

18.   At all times relevant hereto, Defendant, DR. ANDREW S. DEANE, is an adult resident citizen of Carmel, Indiana.

19.   Defendant Deane is an Associate Professor of Anatomy, Cell Biology & Physiology in IUSM and is believed to be servable at 635 Barnhill Drive, Medical Science Building 5035, Indianapolis, IN, 46202.

20.   At all times relevant hereto, Defendant, MICHAEL J. KLEMSZ, is an adult resident citizen of Indianapolis, Indiana.

21.   Defendant Klemsz is an Associate Professor of Microbiology and Immunology at IUSM and is believed to be servable at 635 Barnhill Drive, Medical Science Building 420, Indianapolis IN, 46202.

22.   At all times relevant hereto, Defendant, DR. ABIGAIL KLEMSZ, is an adult resident of Indianapolis, Indiana and is believed to be servable at 705 Riley Hospital Drive, Indianapolis, IN 46202.

23.   Defendant Klemsz is a medical doctor within the State of Indiana practicing pursuant to a medical license bearing License No.: 01044730.

24.   Further, Defendant Dean Klemsz is an Associate Professor of Clinical Pediatrics at Riley Hospital for Children and the Assistant Dean for Academic Advising for IUSM.

25.   At all times relevant hereto, Defendants JOHN DOES 1-25 are fictitious names for individuals who at all times were, upon information and belief, acting in their individual capacities, but whose identities are presently unknown to Plaintiff. Plaintiff will seek leave to substitute these Defendants, if necessary, when their identities become known to Plaintiff.

26.   At all times material hereto, each defendant was the agent, servant, workman, and/or employee of each other defendant and was acting within the course and scope of their relationship with each other defendant.

**JURISDICTION AND VENUE**

27.    This action seeks damages under federal law, specifically 42 U.S.C. §1983, the ADA, The Rehabilitation Act, and the Civil Rights Act. As such, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

28.    In accordance with 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over Plaintiff's state law claims for breach of contract, promissory estoppel, and intentional infliction of emotional distress because these claims are so closely related to the federal claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

29.    Venue properly lies within this District under 28 U.S.C. § 1391(b). The named defendants perform their official duties in the southern District of Indiana, and the events and omissions giving rise to plaintiffs' claims occurred in this District.

**FACTS APPLICABLE TO ALL CAUSES OF ACTION**

30.    Indiana University (hereinafter, "IU") is a system of public universities in the State of Indiana.

31.    According to its website, IU School of Medicine (hereinafter, "**IUSM**") is the largest medical school in the United States. IUSM is comprised of five (5) basic science departments and twenty (20) clinical departments and offers training for students wishing to pursue a medical degree.

32.    With the Class of 2020, the school implemented a new medical education curriculum that "better" reflects the modern U.S. health care environment and delivery models, readying students to practice medicine in a team-based, interdisciplinary setting.

33.    IUSM offers, among other programs, the Doctor of Medicine (hereinafter, "MD") Program. The MD Degree Program offers a nationally recognized, fully accredited four-year medical education program leading to a MD.

34.    According to the IUSM website, the MD program at IUSM is the largest graduate medical education program in the United States, having nine (9) campuses and "strong partnerships" with teaching hospitals throughout the state, the school offers "unparalleled" opportunities and resources for students to explore their interests and pursue specialty training to prepare for successful careers.

35.    The four (4) years of medical school are divided into three (3) phases.

36.     The first two (2) years focus on the basic sciences with clinical integration; the third- and fourth years are devoted solely to clinical experiences with emphasis on specialty training for career placement in the fourth year.

37.     According to IUSM's website[1]:

> Fundamental aspects of the school's MD curriculum—including teaching modalities, integrated courses, faculty expertise in clinical and basic sciences, and block scheduling—are available to students on all campuses, but each campus offers a unique experience that comes with interacting with the community and participating in the local clinical setting. So while students in Gary gain experience in caring for low-income patients in an urban environment, students in Terre Haute learn the specific challenges and needs of serving a rural patient population. The Bloomington campus focuses on medical education, and students in Muncie receive especially strong exposure to primary care. The special amenities of each location benefit medical students in many different ways, and some students experience multiple campuses during their medical education training. MD students participate in clinical rotations at hospitals and physician offices throughout the state during the third and fourth years of medical school.

38.     IUSM's Gary campus is located on the IU Northwest campus in a highly populated urban region, south of Lake Michigan and just 25 miles from downtown Chicago.

39.     According to its website[2], students at this campus benefit from the IUSM's "high-quality statewide MD curriculum with the additional opportunity to join a unique four-year MD program in urban medicine, emphasizing primary care and other specialties of need in medically underserved communities."

40.     Further, the Gary campus has eleven (11) major teaching hospitals in the area with approximately 2,800 beds, and medical students at the Gary campus have a "vast variety of medical training opportunities".

41.     Medical education programs leading to the MD degree in the United States and Canada are accredited by the Liaison Committee on Medical Education (hereinafter, "LCME").

42.     The LCME's scope is limited to complete and independent medical education programs whose students are geographically located in the United States or Canada for their education and that are operated by universities or medical schools chartered in the United States or Canada.

---

[1] https://medicine.iu.edu/md
[2] https://medicine.iu.edu/gary

43.     LCME accreditation is a voluntary, peer-reviewed process of quality assurance that determines whether the medical education program meets established standards.

44.     To achieve and maintain accreditation, a medical education program leading to the MD degree in the United States and Canada must meet the LCME accreditation standards contained in the LCME document, "Functions and Structure of a Medical School."

45.     Programs are required to demonstrate that their graduates exhibit general professional competencies that are appropriate for entry to the next stage of their training and that serve as the foundation for lifelong learning and proficient medical care.

46.     The LCME is recognized by the U.S. Department of Education as the notable authority for the accreditation of medical education programs leading to the MD degree.

47.     The Accreditation Council for Graduate Medical Education ("ACGME") is an independent, 501(c)(3), not-for-profit organization that sets and monitors voluntary professional educational standards essential in preparing physicians to deliver safe, high-quality medical care to all United States citizens.

48.     ACGME defines graduate medical education ("GME") as the period of education in a particular specialty (residency) or subspecialty (fellowship) following medical school and oversees the accreditation of residency and fellowship programs in the United States.

49.     Graduates of LCME-accredited schools are eligible for residency programs accredited by the ACGME.

50.     The United States Medical Licensing Examination (hereinafter, "USMLE") is the exam administered by the National Board of Medical Examiners (hereinafter, "NBME").

51.     The Federation of State Medical Boards ("FSMB") and the NBME sponsor the USMLE.

52.     The USMLE provides state medical boards with a common evaluation system for licensure applicants.

53.     As of August 2022, the USMLE consists of three separate exams, known as steps: STEP 1 assesses the basic sciences taught during the pre-clerkship curriculum; STEP 2 assesses clinical knowledge and skills that can be applied to patient care under supervision; and STEP 3 assesses in-depth clinical knowledge and decision-making to be able to care for patients independently.

54.     On or about August 2019, Plaintiff started the Doctor of Medicine program at the Indiana University School of Medicine, where he was assigned to attend the Northwest/Gary Campus (hereinafter, "Gary Campus").

55.     There were several issues of unprofessionalism, ethics violations, discrimination, and failures of due process when it came to Plaintiff's interactions with the faculty and staff at the University.

56.     The issues that Plaintiff has encountered with the school extend all the way back to 2019, and those issues were never adequately addressed.

57.     Plaintiff soon learned that  there were no mental health resources nor professionals who specialize in this area at the Gary campus.

58.     On or about the start of the school year, students were assigned a physician to shadow by IUSM as part of a graded assignment.

59.     However, the physician that the Plaintiff was assigned did not consent to being part of the program.

60.     Plaintiff informed Defendants of this, however, Defendants refused to reassign or help Plaintiff find a new physician to shadow.

61.     In order to not fail, Plaintiff was forced to find a physician to shadow on his own.

62.     During that time, Plaintiff was enrolled in the Human Structure (Anatomy & Histology) course, in which students are expected to work with a cadaver.

63.     Doing so is essential for their understanding of the learning objectives.

64.     On or about the Fall of 2019, Plaintiff's study group received a body that was not in a workable nor explorable condition.

65.     None of the professors would assist nor provide any guidance with respect to this.

66.     Further, Plaintiff attempted to benefit from IUSM's tutoring service twice for assistance with the Anatomy class, and Defendants failed to provide Plaintiff with a tutor.

67.     Additionally, by that time, Gary campus' lead learning strategist was let go, and thus, Plaintiff could not obtain any help or support from their office.

68.     On or about 2019, because of the poor learning resources provided at the Gary campus, Plaintiff was failed for the Human Structure course despite having a higher score than the minimum passing score for previous years and again for the following year, 2020.

69.     On or about Spring 2020, Plaintiff also failed his Neuroscience and Behavior class.

70.     It should be noted that this was at the beginning of the pandemic, at a difficult time for everyone in the world, particularly students who were struggling with their studies.

71.     During the COVID lockdown, students were forced to go online and adapt their learning through alternative methods, which was incredibly challenging for students of all levels.

72.     Because of this, many schools and universities were more lenient in evaluating the students' performance.

73.     IUSM however, drastically changed the syllabus for the Neuroscience and Behavior (Spring 2020) course right before it began, which had a negative impact on Plaintiff's learning abilities and performance.

74.     For instance, as per the course syllabus, students would spend half the contact hours in the course in small group sessions.

75.     Some small group sessions were "designed to reinforce and augment information acquired via lecture, textbook readings, and independent study; other small groups provided opportunities for the presentation and discussion of novel information not acquired elsewhere; other small groups were laboratory sessions designed to provide structured learning opportunities focused on clinically relevant aspects of CNS anatomy, and others small groups activities are designed to facilitate the acquisition and application of medical knowledge while simultaneously promotion essential team-based and self-directed learning skills, including problem solving, effective communication and professionalism".

76.     However, Defendants and IUSM completely changed the dynamic, and students were removed from their small groups and were forced into large one hundred (100) person groups, which made it extremely challenging for Plaintiff to learn or concentrate during class.

77.     This also made Plaintiff unable to access help from any of the assistant professors.

78.     Another example of the organizational disaster that changing the syllabus ensued was that Defendants failed to grade Plaintiff as per NBME requirements, and thus violated NBME's rules.

79.     To complete a course, medical students are required to pass a final exam ("NBME exam") that follows the standards and guidelines set forth by NBME.

80.     Defendants violated NBME requirements and issued a final exam, which was a take-home test and which questions were not representative of NBME style questions.

81.     Furthermore, Defendants' negligent lack of planning resulted in the exam being so irresponsibly disorganized and unsupervised, that several students were posting videos on the social media platform Snapchat of them taking the exam together, which was prohibited.

82.    This also gave those students an unfair advantage compared to Plaintiff, who followed protocol and took the exam as instructed.

83.    Additionally, class resources that were said to be posted online on the CANVAS webpage such as lecture videos, mandatory assignments, and lecture PowerPoint slides were frequently unavailable to students due to fundamental issues with the school's website and CANVAS webpage.

84.    Once again, each request by Plaintiff to receive assistance from the course leadership at this time was ignored.

85.    On or about January 7, 2020, and prior to finding out he failed the Neuroscience and Behavior (Spring 2020) class, Plaintiff had requested to transfer to another IUSM campus due to the issues previously described.

86.    Five (5) other students from his class of thirty (30) also requested to transfer campus.

87.    On or about March 4, 2020, Plaintiff was notified via email that his transfer request was approved.

88.    As a direct result of Defendant's failures and the lack of support such as poor equipment, materials, inadequate resources, lack of guidance and mentorship, Plaintiff had to retake his first year of medical school ("MS1") for having failed two courses.

89.    On or about August of 2020, Plaintiff started MS1 over again at the Indianapolis campus.

90.    The following events all occurred in Indianapolis.

91.    Despite having gone through orientation the previous year at Northwest Gary Campus, Plaintiff had to attend orientation again in August 2020.

92.    Plaintiff's Indianapolis Lead Advisor did not know that Plaintiff was in her orientation group and eventually explained in front of Plaintiff's peers that it might have been because Plaintiff was a repeating MS1.

93.    This negligent, unprofessional, and clear violation of Plaintiff's rights as a student caused him embarrassment that lasted throughout his time at IUSM, as other fellow students would often undermine his answers in groups during class because he was a repeating student.

94.    Per the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99) any disciplinary record or actions of having to repeat classes is confidential information that is not to be shared with anyone without the student's permission.

95.    Since Plaintiff did not sign a release, the information should not have been shared.

96.     Another instance of Defendants violating confidentiality towards Plaintiff's affairs, occurred on or about September 2020, when lead advisor and Dean of Education, Dr. Okoro, leaked an email to the professor of Anatomy & Physiology (Human Structures), Dr. Deane, which Plaintiff had sent to her in confidence.

97.     Dr. Okoro had performed this action without Plaintiff's knowledge nor authorization.

98.     When Plaintiff arrived to the Anatomy Lab, he was pulled aside by Dr. Deane and was berated in front of his lab group.

99.     Dr. Deane told Plaintiff he would fail the class if he did not work harder and stopped complaining, although Plaintiff had simply asked whether the Teaching Assistants could come help his group during the next class.

100.    During the next two (2) years at IUSM, Plaintiff did not fail any final exams nor any classes, which attests to his intelligence, skills, talent, discipline and to how seriously he takes his academics.

101.    On or about Fall of 2020, Plaintiff was also wrongly accused of cheating on a Human Structures (anatomy) exam by school faculty.

102.    On or about September/ October 2022, Plaintiff took the NBME final examination for Human Structures in-person in IUSM's computer lab with other classmates.

103.    The exam was taken on NBME software, which must be installed on student laptops prior to the exam.

104.    There is a certification test that students are required to complete prior to taking the NBME exam.

105.    Plaintiff performed all the required actions, and his computer was certified to take the exam, however, Plaintiff's personal laptop computer would not load the NBME exam software when he arrived to take the exam, and so he asked for assistance from the professors and from a computer lab technician.

106.    After they performed multiple attempts to start the exam, it was determined it would be easier to start his exam on a school computer located in the same exam room next to other students.

107.    As a result, Plaintiff had an hour less than other students to take the exam on a school computer.

108.    Even despite this, Plaintiff still managed to pass his exam and the Human Structure course in the Fall of 2020.

109.    However, Plaintiff was notified over e-mail that he was being accused of cheating on his NBME final examination five (5) days after students received their exam scores.

110.    The faculty members involved in this meeting stated that software on his personal laptop computer had been flagged by the NBME exam software.

111.    However, Plaintiff had performed the NBME certification tests, and he had not received any alerts regarding any conflicting software on his laptop computer.

112.    It should be noted that Plaintiff had discussed the computer issue with the professors and technicians underline prior to starting the exam and had *less* time than other students to complete the exam because of the computer issue. That is, Plaintiff directly told the professor Dr. Andrew S. Deane that he was having trouble with his computer and that he took the exam on a school's computer, and yet, aware of this, Defendants accused Plaintiff of cheating with software on his laptop.

113.    As part of this investigation, Plaintiff was able to prove that it was impossible for him to have cheated, since he took the exam on a locked IUSM computer, not his laptop.

114.    This accusation took one (1) month to resolve, leaving Plaintiff understandably anxious and preoccupied while he was still attending and studying for other classes as well as dealing with COVID.

115.    Plaintiff was also left without any help from school faculty this time, especially from Foundations of Clinical Practice ("FCP") faculty, that he had reached out to for help regarding this matter.

116.    As such, Plaintiff felt that he was made to feel that he was guilty before there had even been an actual investigation.

117.    This false accusation not only affected his studies, but also had a negative impact on his mental health.

118.    After being falsely accused of cheating, he was told that "as a repeating student, you have all the incentive to want to cheat."

119.    He was not issued an apology and instead had to demonstrate how it was impossible for him to cheat given that he took his NBME examination on a school computer in class.

120.    Plaintiff did not cheat on any exams or work that he had turned in up to that point or at any point in medical school, so there was no reason for making such a defamatory allegation.

121.    On or about September 8, 2021, a fellow student was wrongly accused of sexual misconduct during FCP class while practicing with a Portable Ultrasound machine on a standardized patient.

122.    Since Plaintiff was present during the event that led to the other student's accusation, he had firsthand knowledge of the allegations being made.

123.    As such, on or about October 2021, Plaintiff was contacted by the accused student and his attorney to be a witness in the Title IX disciplinary process.

124.    As a result, between October 2021 and December 13, 2021, Plaintiff had to attend fourteen (14) separate meetings with school officials, the accused student's lawyer, IUSM's lawyers, and Kelly Freiberger, the Student Conduct Specialist, amongst others.

125.    Plaintiff advocated for the student, and ultimately, the student was cleared of any wrongdoing.

126.    This took away large amounts of study time and forced Plaintiff to lose focus on his academics.

127.    Final exams were the same week as the hearing.

128.    It should be noted that December 13, 2021, the day of the hearing, was on a Monday of final exams week.

129.    During this time, Plaintiff was also placed with the accused student for every other Objective Structured Clinical Examination ("OSCE") they had for the semester, when usually students switched or rotated groups.

130.    This decision by Defendants gave Plaintiff anxiety out of fear of making a wrong move since he had previously been targeted and noticed a different treatment from Defendants to the rest of the students, raising concern that during the FCP clinical skills exams (OSCE), he could possibly be dismissed.

131.    This created a hostile environment for Plaintiff, as he felt that everything he did was being watched more closely than ever.

132.    Despite previous semesters wherein Plaintiff had received nothing but positive feedback and exceptional scores on his FCP clinical skills exams, Plaintiff was repeatedly and wrongly failed on the exams.

133.    For instance, on or about Spring 2021, Plaintiff was wrongly failed on the final clinical skills exam because his writing component was "insufficient."

134.    Plaintiff received this news thirty-eight (38) days after the OSCE took place and fifteen (15) days after the final day of the semester.

135.    In addition, Plaintiff's class did not receive any grades or feedback for their OSCEs from the entire Spring 2021 semester until over a month after the final OSCE and after the school semester had already ended.

136.    This meant they had no feedback or graded assignments from which to learn throughout the entire Spring 2021 FCP semester.

137.    Upon review of Plaintiff's video recorded OSCE with the course director, it was determined there was nothing insufficient about his writing component and that points were deducted for things that were not even on the rubric.

138.    Plaintiff was also told by the course director that he should not have been penalized a single point as per the rubric.

139.    Moreover, regarding Plaintiff's failure to perform a kidney stone examination, Foundations of Clinical Practice Year 2 ("FCP2") course professors specifically stated this would not be on the Fall OSCE as the class had not yet completed the Renal part of the Renal & Respiratory course.

140.    Students, including Plaintiff, had no prior Rapid FCP OSCE practice sessions.

141.    On or about January 17, 2022, Plaintiff was notified that he failed the OSCE from October 22, 2021, which is well over the six (6) weeks the LCME requires that student grades must be reported within.

142.    Once again, the Plaintiff had to prove via the video of the OSCE that he did nothing wrong and should pass the exam.

143.    Despite the fact that Defendants switched Plaintiff's score to passing, he still had to attend an extra OSCE because of his initial incorrect "failure."

144.    When Plaintiff showed up to this additional forty five (45) minute OSCE, he was informed that there were no standardized patients to perform the OSCE on, which was a common occurrence during the year.

145.    The only reason for Plaintiff to take the additional OSCE was for the alleged failure, which was reversed because it was found not to be Plaintiff's fault.

146.    In turn, Plaintiff should not have had to attend this extra OSCE.

147.    This continues to show the bad faith exercised by the Defendants while being targeted and intentionally setting him up to fail.

148.    During Plaintiff's final OSCE exam in Spring 2022, Defendants removed all the timers from the room during Plaintiff's exam and provided nonfunctioning equipment.

149.    The timers and other equipment were necessary to take the exam, which is another direct LCME violation.

150.    This was reported to Plaintiff's advisor, who attempted to communicate this to the course faculty on February 2, 2022, however, they received no acknowledgment of the communication.

151.    Moreover, Plaintiff did not receive a grade for this OSCE until the end of March of 2022, which is another LCME violation.

152.    On or about January 25, 2022, STEP 1 changed from a scored grade exam to pass/fail exam.

153.    In addition, the passing score was raised by two points, and the question format changed.

154.    Plaintiff had originally planned to take the exam before this change, however, dealing with the Title IX case took up the time he had planned to study and prepare for the exam.

155.    On or about January 13, 2022, Plaintiff took a practice STEP 1 exam, required by the school and received a score of 220, significantly above passing.

156.    As a result of the stress of waiting for his final OSCE score, he had to change the original date of his STEP 1 exam from February 26, 2022.

157.    Not only did Plaintiff lose out on study time, but he was also put under undo stress and anxiety from the OSCE.

158.    The repeated wrongful failures led Plaintiff to have exam anxiety, with which the school psychologist Dr. Lasik diagnosed him.

159.    This caused him to fail to pass his STEP 1 exam.

160.    It should be noted that Plaintiff had still not received the score for his OSCE by the time he took STEP 1 on March 19, 2022.

161.    After STEP 1, Plaintiff met with Dr. Abigail Klemsz about the FCP issue.

162.    She told Plaintiff that he should "go to a different medical school or pick a different career" in front of his lead advisor, who was also on the Zoom call.

163.    Instead of helping him navigate the situation, she wrongfully disregarded Plaintiff's concerns and requests for help.

164.    This demonstrates that Defendants' intention from the beginning was to dismiss Plaintiff.

165.    After failing STEP 1, Plaintiff was notified that he would not be enrolled or considered as a student by the medical school, so it has not provided him with financial aid since March 2022, despite not being dismissed from school and being in the appeals process through October 2022.

166.    On or about April 6, 2022, Dean Klemsz notified Plaintiff about his STEP 1 failure and told him to meet with the Student Promotions Committee ("SPC") to discuss his situation further.

167.    On or about April 15, 2022, Plaintiff received an email from Associate Dean Martin Reeser, which notified him that he was to attend a meeting with the SPC on April 25, 2022.

168.    After this, Plaintiff had to write multiple appeal statements in order to receive a meeting to determine if he was allowed to retake the STEP 1 exam, in addition to meeting with faculty, and devising a new study plan.

169.    Defendants would not allow Plaintiff to sign up to retake the exam in order to secure a reasonable exam date until he had a committee meeting, while other students in the same position only had to write a letter and were immediately allowed to sign up to retake the exam.

170.    This is yet another example of Defendants' unequal treatment of the Plaintiff.

171.    The Student Promotions Committee did not hear Plaintiff's appeal for twenty-one (21) days post notification of failure, which is unreasonable considering the time constraints for these exams.

172.    On or about April 27, 2022, the SPC finally approved Plaintiff's appeal and allowed him to retake the exam; however, they only allowed him twenty-three (23) days to study and to take the exam instead of the allotted six (6) weeks of dedicated study time, which was the time given to every other student who retook the exam in the past.

173.    Despite Defendants having set a date for Plaintiff to retake the exam, Plaintiff was not allowed to register for the test for another two (2) weeks after the Committee meeting.

174.    This added even more distress because Plaintiff had to find an exam date while also studying.

175.    Moreover, Plaintiff was severely limited on the test dates and times available.

176.    He had to take the exam 2.5 hours away from where he lived, keeping in mind that the exam started at 8:00 a.m. and was eight (8) hours long.

177.    Plaintiff had made it clear to the SPC that he was facing transportation problems and would benefit from being able to take the exam in Indianapolis, which would have been possible if he was given more time to choose an exam date.

178.    Plaintiff's request was again ignored by the Defendants.

179.   On or about May 2022, during the time Plaintiff was supposed to be focusing on studying for the STEP 1 retake, IUSM still made him attend a preparatory class for clinical rotations.

180.   The class took place in person and, once again, cut into his study time.

181.   Not only did Plaintiff not have the full six weeks to study, as students normally get six weeks of dedicated study time before taking the STEP 1 exam, but he also he did not have unrestricted study time, given the other obligations imposed by Defendants.

182.   Plaintiff retook the STEP 1 exam on or about June 1, 2022, and received notice of failure of his second STEP 1 exam on or about July 2022.

183.   On or about July 13, 2022, Plaintiff was notified that he failed the STEP1 exam for a second time and was dismissed by the program.

184.   The score reporting took longer than usual because the NBME was on a score reporting delay at the time.

185.   As such, Defendants could have allowed Plaintiff more time to study for and take STEP 1 due to the delay.

186.   On July 25, 2022, Plaintiff submitted an appeal to challenge SPC's decision to dismiss him.

187.   Plaintiff's health insurance was terminated on July 31, 2022, also while he was still in the appeals process and had yet to be officially dismissed.

188.   This put additional stress, anxiety, and pressure on him.

189.   Moreover, this prevented Plaintiff from being able to access medical care, especially for his declining mental health, given all the anxiety and distress provoked by Defendant's targeting to dismiss Plaintiff.

190.   On or about August 9, 2022, the Appeals Committee meeting was held.

191.   Plaintiff had another appeal to take STEP 1 a third time, since only three (3) attempts are allowed by IUSM, as stated in the University's handbook, while NBME allows four (4) attempts.

192.   In addition, students are allowed six (6) years to complete medical school, according to the University's handbook.

193.   After meeting with several deans at IUSM, they made it seem to Plaintiff as if it was not a big deal to take the exam a third time.

194.   On or about July 2022, Plaintiff met with several deans, his advisor, and mental health professionals to seek advice on writing yet another appeal, creating a new study schedule, and submitting a letter on his exam anxiety.

195.    As before, Plaintiff had to wait another thirty-four (34) days after notice of failure of his second STEP 1 exam for this appeal committee meeting to take place.

196.    These long wait times put Plaintiff at a disadvantage because they made him start to lose his memory of the material on the exam and drained Plaintiff from his financial resources.

197.    Plaintiff submitted the new documents and study plans to the committee on or about two (2) weeks prior to the meeting.

198.    About one (1) week prior to the Appeal Meeting, Defendants emailed Plaintiff to tell him that the committee had been changed from seven (7) members to fourteen (14) members, and that the Chairman would be changed, as well.

199.    Plaintiff entered the appeal meeting on Zoom and was surprised to see Dr. Deane, the professor who wrongly accused him of cheating on the Human Structures exam in August 2020, and to whom his email to his advisor was leaked, present as a voting member on the Appeal Committee, a blatant ethical violation and conflict of interest.

200.    The Appeals Committee meeting started an hour later than it was supposed to and only lasted for twenty (20) minutes.

201.    The Committee only asked a few general questions, such as when Plaintiff would retake the exam and, "how do you handle chaos?"

202.    During the twenty (20) minute appeal meeting,  it was apparent to Plaintiff that some of the members appeared intimidated by the new chairman of the Committee, and their questions for the Plaintiff were cut short or interrupted by the chairperson who stated that questions from some of the Committee members were "irrelevant."

203.    Plaintiff was surprised that Dr. Deane was allowed to be a voting member of the IUSM Student Appeals Committee as he was assured that there would be no voting members with a direct conflict of interest on his appeal committee.

204.    However, this was a clear conflict of interest as Dr. Dean's accusations of cheating were false and unfounded, and there was no reason this same professor should have had a voting say in the outcome of Plaintiff's medical school career.

205.    Furthermore, Plaintiff's appeal was purposely delayed, ensuring that Defendants would have grounds for his dismissal just after IUSM formed a new rule at the beginning of 2022 providing that students had a maximum of three (3) attempts to complete STEP 1.

206.    That limitation is against the Student Handbook for IUSM.

207.    Plaintiff felt as though they were explicitly changing rules to directly affect him, in addition to the drawn-out appeals processes.

208.    On or about August 11, 2022, Plaintiff was notified of the Appeal's Committee's decision to uphold Plaintiff's dismissal.

209.    Plaintiff had one more review of the decision through the head Dean of the medical school.

210.    On or about August 31, 2022, Plaintiff had a meeting with Dr. Marly P. Bradley, who was an OMBUDS representative, to discuss the conflict-of-interest of Dr. Dean's participation on the Appeal's Committee meeting.

211.    Dr. Bradley told Plaintiff that his concern regarding the Conflict of Interest was a valid flaw in the appeal process and that she would notify the Dean on Plaintiff's behalf.

212.    After Plaintiff's meeting with Dr. Bradley, the Appeal Meeting with Dean Hess, which was originally scheduled for September 7, 2022, was urged, and moved up to September 1, 2022.

213.    Twenty-three (23) days later, Plaintiff had a rushed meeting with the Dean for thirty (30) minutes where he asked questions not pertaining to his current situation or appeal, such as why Plaintiff did not have a driver's license in 2020 (which is when he became a US citizen, had a name change, and had to mail in his documents due to the federal offices being shut down due to COVID).

214.    Dean Hess told Plaintiff that he would give serious consideration to his appeal, however, merely thirty (30) minutes later, Plaintiff received an email from one of the Dean's secretaries, upholding his dismissal.

215.    Plaintiff felt as if his fate was already decided prior to the meeting.

216.    Plaintiff was forced to choose between "voluntarily" withdrawing by October 2022 or being dismissed by the school.

217.    He chose to voluntarily withdraw.

218.    Plaintiff was very close with his lead advisor from the Gary Campus, Alison (Ali) Zovko, who he knew from his first day at IUSM.

219.    After Alison and Plaintiff worked together on his appeals process, they were both extremely shocked and confused by the outcome as well as the lack of professionalism from Defendants.

220.    Hence, it was extremely odd and surprising that Alison, Plaintiff's lead advisor, abruptly took a three (3) week leave on the day of Plaintiff's dismissal/withdrawal from IUSM.

221.    Plaintiff had never seen her or other lead advisors take such abrupt vacations or leaves in the middle of the school year.

222.    Additionally, Defendants did not allow Alison and Plaintiff to communicate after his appeal, as his school .edu email account was immediately suspended and/or terminated.

223.    Plaintiff, out of hundreds of students, had secured a summer internship program in Plastic Surgery for the Summer of 2020 with Dr. Gale Gordillo, who is the Dr. Sanford & Thelma Glanz Professor and Chief of the Division of Plastic Surgery.

224.    The experience and stipend would have been of great help to further Plaintiff's professional career, and yet, he was forced to forgo the experience after failing the school year.

225.    The lack of timely communication caused Plaintiff a great deal of anxiety and inconvenience.

226.    Because of this short notice of the dismissal, and the extensive and exhausting appeal process he was subject to, Plaintiff was not given appropriate time to find housing, manage his medical needs, and the experience exacerbated his anxiety condition.

227.    In addition, Defendants would not help Plaintiff obtain financial aid for the upcoming school year despite him having alerted IUSM about a problem with his Social Security Card and Driver's License.

228.    Plaintiff had recently become an American Citizen in July of 2019, and had taken his father's family last name of Jois (changing his name from Nikhil Bharadwaj to Nikhil Bharadwaj Jois).

229.    As Plaintiff needed to obtain updated paperwork from the federal government to be granted financial aid, he submitted his documents via mail and expected to receive his documents back in thirty (30) days.

230.    However, because of COVID-19, federal offices had shut down, and Plaintiff was unable to obtain his paperwork for nine (9) months.

231.    Thus, since March of 2020, Plaintiff was without his driver's license and Social Security Card, and he made IUSM aware of this problem.

232.    Even so, the financial aid advisor, Mr. Jose Espada, was not helpful in helping him obtain financial aid, and the school refused to provide any accommodations to help Plaintiff while he waited for his updated paperwork to come back.

233.    The oversight of failing to relay necessary information became a theme amongst the faculty as they expected complete professionalism from their students, but did not demonstrate the same professionalism in return.

234.    Plaintiff has a diagnosed anxiety disorder that affects his ability to effectively communicate with others.

235.    IUSM was made aware of Plaintiff's disability, as it was diagnosed by a psychiatrist who was contracted by IUSM.

236.    Defendants failed to take Plaintiff's anxiety, ADHD, and depression into account by not providing him with the necessary tools and resources to excel in his academics,

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF 42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT**

237.    Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above, and incorporates same as if fully set forth at length herein.

238.    The Fourteenth Amendment of the U.S. Constitution provides, in pertinent part, that "no person shall be deprived of life, liberty, or property without due process of law."

239.    As such, Plaintiff was entitled to a fair and impartial investigation of the allegations lodged against him in accordance with the policies established concerning dismissal from the medical school program at IUSM.

240.    The Defendants were aware that Plaintiff was entitled to a fair and impartial determination of the merits of the charges against Plaintiff.

241.    Plaintiff was dismissed from his studies site as a result of an arbitrary evaluation of his conduct that was not brought to Plaintiff's attention until he was dismissed and was a direct result of the Defendants violating Plaintiff's civil rights.

242.    Plaintiff has been denied his due process rights by Defendant in violation of the Fourteenth Amendment in that:

   a.    Plaintiff was treated unfairly in the academic decision process and was dismissed from the IUSM program in an arbitrary and capricious manner.

   b.    He had to endure a lengthy and traumatic bureaucratic process designed for him to not be able to contest a dismissal, which also, ultimately resulted in worse performance given the added stress and anxiety.

c.  Plaintiff was not given notice of grounds for dismissal until he received the letter that he was removed from the program.

d.  Plaintiff did not receive the benefit of an impartial hearing before his punishment of dismissal was imposed.

e.  Plaintiff's hearing's result was a conflict of interest by having Dr. Dean, someone who previously had falsely accused him of cheating as a voting member of the committee.

f.  Plaintiff's dismissal was based on Plaintiff's alleged academic failures, which were Defendant's own wrongdoing and responsibility.

g.  Defendants acted in an arbitrary, capricious and unreasonable manner in consistently violating its own internal policies, rules, and regulations.

243.   As a direct and proximate result of Defendants' actions, Plaintiff has suffered emotional distress as well as serious threats to his chosen career as a medical doctor.

244.   The Defendants are part of a public university. Consequently, they were acting under color of state law at all times relevant to this litigation.

**COUNT II**
**BREACH OF CONTRACT**
**(As Against Defendant IUSM)**

245.   Plaintiff incorporates by reference each previous paragraph of this complaint as if fully copied and set forth at length herein.

246.   Plaintiff and Defendant entered into a contract by which Plaintiff was offered admission to IU's School of Medicine in consideration for tuition.

247.   As part of the contract was the existence of policies set forth by IU. As a condition of attending IUSM, Plaintiff and IUSM were both expected to be bound by those policies.  Included within those policies were policies concerning adequate grounds for dismissal , disability services as well as student academic support, amongst others.

248.   These policies were part of the bargain between the Parties. Without agreeing to abide by these policies, Plaintiff would not have been permitted to attend IUSM. Plaintiff performed under the contract by paying tuition and following school policies. Defendant breached the contract by arbitrarily changing its policies and dismissing Plaintiff without due process.

249.   Defendant also breached the contract by not properly providing Plaintiff's with services related to his disability.

250.     Defendant also breached the contract for failing to provide Plaintiff with basic resources for his learning of the medical profession.

251.     Defendant also breached the contract by not providing Plaintiff the high quality medical training and education.

252.     As a result of Defendant's breach of the contract, Plaintiff has been damaged in that he has been forced to expend significant time and resources defending the allegations that resulted in his dismissal. He has also lost the value of the investment he put into his medical education.

### COUNT III
### VIOLATION OF TITLE III of the ADA
### (As Against all Defendants)

253.     Plaintiff incorporates by reference each previous paragraph of this complaint as if fully copied and set forth at length herein.

254.     Plaintiff suffers from a chronic mental health condition because of being diagnosed with anxiety.

255.     Plaintiff was also diagnosed with depression and ADHD and was under medication treatment through a third-party contracted psychiatrist providing services to IUSM at the time of the events.

256.     Plaintiff has serious medical needs, ADHD, anxiety, and depression and is a qualified individual with a disability. His disabilities substantially interfere with the major life activities of thinking, concentrating, and communicating, among others.

257.     The ADA and its implementing regulations require that alternative services and modifications be made to qualified individuals with a disability.

258.     At all relevant times, Defendants were fully aware of Plaintiff's disabilities.

259.     Plaintiff has been denied reasonable accommodations for his documented anxiety disorder, ADHD, and depression disorder.

260.     As a result of Defendants denial of reasonable accommodations to Plaintiff, Defendants violated the ADA by discriminating against Plaintiff in several ways, including, without limitation, the following:

   a.     Failing to recognize that Plaintiff had an anxiety disorder, ADHD, and depression when IUSM was on notice of his disabilities.

   b.     Failing to provide counselling to Plaintiff to assist with his disabilities.

   c.     Failing to have mental health resources available on Gary's campus.

d.    Failing to provide Plaintiff with more time to complete documentation, exams, and other clinic assignments.

e.    Denying Plaintiff equal opportunities to receive an education as a medical student as those without disabilities

261.    Defendants have discriminated against Plaintiff by failing to provide a full and equal opportunity to enjoy the services Defendants provide.

262.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered emotional distress as well as serious threats to his chosen career as a medical doctor.

**COUNT IV**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**(Against all Defendants)**

263.    Plaintiff incorporates by reference each previous paragraph of this complaint as if fully copied and set forth at length herein.

264.    Section 504 of the Rehabilitation Act, 29 U.S.C § 794, bars all federally funded entities (governmental or otherwise) from discriminating based on disability. Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
>
> 29 U.S.C. § 794(a).

265.    Defendant IUSM receives federal financial assistance and is covered by Section 504.

266.    Plaintiff has anxiety disorder, ADHD and depression which interferes with his ability to effectively communicate certain issues and advocate for himself. Plaintiff also struggles with concentration and time management. Communication, concentration, and time management are major life activities. Thus, anxiety, ADHD, and depression substantially limit at least one of Plaintiff's major life activities.

267.    Because anxiety, ADHD, and depression substantially limits at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the Rehabilitation Act.

268.    Plaintiff has demonstrated a history of success as a student with anxiety, ADHD and depression and has even managed to pass his courses, despite the additional difficulties inherent to his conditions.

269.     The Rehabilitation Act and its implementing regulations require Defendants administer programs/activities in the most integrated setting appropriate to the needs of qualified handicapped/disabled persons. 28 C.F.R. § 41.51 and 45 C.F.R § 84.4.

270.     Plaintiff has been denied and excluded from the benefits of Defendants' educational program because Defendants have failed to make reasonable accommodations that meet Plaintiff's needs.

271.     As a result of Defendants denial and exclusion of Plaintiff from receiving reasonable accommodations commensurate with his anxiety, ADHD and depression disorders, Defendants violated the Rehabilitation Act in several ways, including without limitation the following:

      a.     Failing to act when Defendants knew of Plaintiff's anxiety, ADHD and depression.

      b.     Failing to provide Plaintiff reasonable options to combat anxiety, ADHD and depression during his placement such as more time to complete documentation and turn in assignments.

      c.     Failing to provide counselling and mental health resources to Plaintiff to assist with his disabilities.

      d.     Denying Plaintiff equal/same opportunity to receive an education as a medical student as those without a disabilities

      e.     Inducing Plaintiff's anxiety to aggravate by facing baseless cheating accusations, wrongfully failing his courses, and forcing him to face unnecessary high-stressed situations.

      f.     Inducing Plaintiff's ADHD symptoms of concentration and time management to worsen by breaking smaller student groups into hundreds of people, which made it impossible to concentrate and ask for individualized assistance from IUSM'S professors, teacher's assistant and/or other student support personnel.

      g.     Terminating Plaintiff's Healthcare plan in a premature, untimely manner resulting in him not being able to access medical care, treatment and medication for the disabilities which in turn, aggravated Plaintiff's disabilities and damages.

272.     As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has sustained and will continue to sustain damages.

## COUNT V
## NEGLIGENCE
### (As Against All Defendants)

273.    Plaintiff incorporates by reference the foregoing paragraphs as if fully stated herein.

274.    Defendants breached their duty of reasonable care by negligently acting or omitting to act in such a way that resulted in Plaintiff's wrongful dismissal from IUSM, which these Defendants knew or should have known posed a substantial risk of harm to Plaintiff.

275.    Defendants were negligent in performing their duties and failed, neglected and/or refused to discharge their responsibilities properly and fully by, among other things:

    a.    Recognizing Plaintiff's need for accommodations for his mental health conditions,

    b.    Properly reviewing Plaintiff's needs for accommodations for his mental health conditions;

    c.    Failing to provide Plaintiff with proper accommodations for his mental health;

    d.    Creating and/or sanctioning policies, patterns, practices, and customs of not properly providing reasonable accommodations to those with mental health conditions that impair Plaintiff's ability to learn properly;

    e.    Failing to provide Plaintiff with the resources and support needed to be able to succeed in medical school;

    f.    Terminating Plaintiff's healthcare plan leaving, which prevented Plaintiff to receive his much needed medical treatment.

276.    By their negligent conduct, the Defendants have inflicted extreme and severe emotional distress on Plaintiff, who is confronted with an inability to complete his medical education, practice his chosen profession, earn a living, and to pay his mounting student loan debts.

277.    Plaintiff has suffered direct financial losses due to Defendants' conduct for the above items.

278.    While attending IUSM, because Plaintiff was not provided accommodations he was entitled to, he would suffer from anxiety, depression, insomnia and often go days without sleeping. These episodes led to significant stress and anxiety. On the contrary, Defendants continued to add stressors that significantly increased his anxiety and depression symptoms, as Defendants continued to place obstacles in the way of Plaintiff's professional development.

279.    As a result of Defendants' conduct, Plaintiff has suffered such distress which resulted in panic attacks.

280.    Plaintiff sees a therapist and is being treated for symptoms akin to his anxiety, ADHD and depression.

281.    The growing emotional, psychological, and physical distress that the Plaintiff has suffered was caused directly and proximately by the Defendants' negligent conduct. Furthermore, Plaintiff suffered and continues to suffer financial losses due to Defendants' negligent conduct.

282.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered emotional distress as well as serious threats to his chosen career as a medical doctor.

## COUNT VI
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (As Against All Defendants)

283.    Plaintiff incorporates the foregoing paragraphs by reference as if fully stated herein.

284.    By their intentional and wanton/outrageous conduct, Defendants have inflicted extreme and severe emotional distress on Plaintiff, who is confronted with an inability to complete his medical education, practice his chosen profession, earn a living, provide for his family, and to pay his mounting student loan debts.

285.    As a result of Defendants' conduct, Plaintiff has suffered stress resulting in panic and anxiety attacks.

286.    The growing emotional, psychological, and physical distress that the Plaintiff has suffered was caused directly and proximately by the Defendants' intentional and wanton conduct.

287.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered emotional distress as well as serious threats to his chosen career as a medical doctor.

## COUNT VII
### Violation of Title VI of the Civil Rights Act of 1964
### (Against All Defendants)

288.    Plaintiff incorporates the foregoing paragraphs by reference as if fully stated herein.

289.    Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. 2000(d), prohibits institutions receiving Federal assistance from discrimination based on race, color, or national origin. IUSM is such an institution and its conduct against the Plaintiff allegedly violates Title VI as follows.

290.    IUSM student and faculty population is predominantly Caucasian.

291.    IUSM Faculty made insensitive remarks during meetings, including but not limited to identifying Plaintiff as someone of Sikh origin. For instance, during a meeting with Dr. Okoro, she referred to him as a Sikh and stated "you are all the same."

292.    These remarks, along with additional violations committed by Dr. Okoro --such as leaking a confidential email sent from the Plaintiff, led Plaintiff to request Alison Zovko (who was his original lead advisor from the IUSM Gary Campus) to be his only lead advisor. Defendant refused his petition to remove Dr. Okoro as Plaintiff's lead advisor in Indianapolis.

293.    At all relevant times, Defendants were aware that Plaintiff is of Asian (Indian) descent.

294.    There was a pattern of discrimination against Plaintiff because he is Indian.

295.    While several students in Plaintiff's class year were having academic difficulties, those who were not Indian were provided additional support, which was not made available to Plaintiff.

296.    There was even an instance when a student made a petition for more inclusion and visibility to minorities in case materials and faculty.

297.    Plaintiff was made to feel different because of his race.

298.    Defendant's actions or inactions as described above were intentional and motivated by Plaintiff's race and for no other legitimate purpose.

299.    By the foregoing actions, Defendants engaged in intentional discrimination based on the race of Plaintiffs by providing academic support services to non-Indian descent students that were not made available to him.

300.    Defendants created, facilitated, or allowed to continue a racially discriminatory environment and school environment hostile to minority students such as Plaintiff as evidenced by Administrators who permitted, condoned, and tolerated differential treatment of students with academic difficulties based on their race and/or national origin and which effectively deprived Plaintiff of equal access to educational opportunities at IUSM.

301.    As a direct and proximate result of Defendants' unlawful discrimination and refusal to provide reasonable accommodations, Plaintiff has sustained and continues to sustain injuries and damages.

302.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered emotional distress as well as serious threats to his chosen career as a medical doctor.

## COUNT VIII
## PROMISSORY ESTOPPEL

303.    Plaintiff incorporates the foregoing paragraphs by reference as if fully stated herein.

304.    Defendants made a promise to Plaintiff that they would uphold and adhere to the Student Code of Conduct and Student Conduct Procedures that were clear and definite.

305.     When Defendants made the promise to provide Plaintiff with a full and fair medical education, Defendants knew or should reasonably have expected that this promise would induce the Plaintiff to take some action, including, but not limited to, agreeing to enroll in the Defendant College and complete his education and coursework.

306.     The Plaintiff did take actions to enroll in  IUSM and complete his education and coursework in the Defendants medical school in reliance on the promise.

307.     The Plaintiff was damaged as a result of his reliance and his loss of time spent completing his coursework, money spent on tuition, fees, and room and board, damage to reputation and inability to establish a career and earn future income.

### PRAYER FOR RELIEF

 **WHEREFORE**, the Plaintiff respectfully demands judgment against the Defendants, INDIANA UNIVERSITY, INDIANA UNIVERSITY BOARD OF TRUSTEES, EMILY C. WALVOORD, JAY L. HESS, IYABODE OKORO, ANDREW S. DEANE, MICHAEL J. KLEMSZ, ABIGAIL KLEMSZ, and JOHN DOES 1-25, for the following damages:

    a.     Award the Plaintiff compensatory, general, and special damages as appropriate and as permitted by law, and for an amount in excess of $15,000.00.

    b.     Award the Plaintiff reasonable and necessary attorney's fees.

    c.     Award the Plaintiff costs, fees, and expenses as appropriate.

    d.     Provide any other Relief this Court might deem fair, just, and equitable

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

**LENTO LAW GROUP, P.C.**

Dated: <u>9-4-24</u>        <u>s/ Lawrence A. Katz, Esq.</u>
                LAWRENCE A. KATZ
                Counsel for Plaintiff
                3000 Atrium Way - Suite #200
                Mt. Laurel, New Jersey 08054
                P: (856) 652-2000  EXT 497
                F: (856) 375-1010